Roskin v Northern Adult Day Health Care Ctr. (2023 NY Slip Op 51441(U))

[*1]

Roskin v Northern Adult Day Health Care Ctr.

2023 NY Slip Op 51441(U)

Decided on December 28, 2023

Supreme Court, Kings County

Edwards, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on December 28, 2023
Supreme Court, Kings County

Oleg Roskin, as Administrator of the 
 Estate of BASYA ROSKINA, Deceased, Plaintiff,

against
Northern Adult Day Health Care Center, NORTHERN ADULT DAY CARE CENTER LLC, NORTHERN MANOR GERIATRIC CENTER, INC., and SENIORCARE EMERGENCY MEDICAL SERVICES, INC., Defendants.

Index No. 504323/2017

Plaintiff was represented by Yuriy Prakhin, Esq. of Law Office of Yuriy Prakhin, P.C.
Defendant was represented by Stephen M. Schmitt, Esq. of Kaufman Borgeest & Ryan LLP

Genine D. Edwards, J.

The following e-filed paper(s) read herein:                      
NYSCEF Doc. No.
Notice of Motion, Statement of Material Facts, Affirmations, and Exhibits 170-196
Answering Affirmations and Exhibits 200-203, 205-207, 96-97
Reply Affirmation 209
In this action to recover damages for medical malpractice and wrongful death, defendant [*2]SeniorCare Emergency Medical Services, Inc. ("SeniorCare") moved for summary judgment dismissing the complaint pursuant to CPLR §3212. Plaintiff and co-defendant Northern Adult Day Health Care Center opposed the motion.
Facts
Basya Roskina ("Decedent") was a registrant at Northern Adult Day Health Care Center ("Northern").[FN1]
 Northern was located in the basement of One Prospect Park West, in Brooklyn, with its main entrance on President Street. Northern provided its registrants with three meals per day, activities, and healthcare. Decedent's son, Oleg Roskin ("Plaintiff"), testified that his mother attended the program five days a week, from 8 A.M. to 2 P.M., for more than ten years. 
On October 14, 2015, decedent was eating lunch at Northern, and went to the bathroom near the dining area. SeniorCare's employee Gennadiy Goldvekht, RN, MSN ("RN Goldvekht"), wrote in a post-incident report that on or around 12:25 P.M., decedent was standing next to her lunch table and showed signs of choking; she pointed to her throat and could not talk or breathe. RN Goldvekht became aware of decedent's condition via an intercom announcement for a "nurse stat to the main floor." RN Goldvekht documented that decedent was "pale, with bluish [sic] color of the lips and nails." Yelena Abrakhimova, CNA ("CNA Abrakhimova") noted post-facto, that upon observation, decedent came out of the bathroom, "looked like she was chocking [sic]," prompting CNA Abrakhimova to alert Lesya Tarascina, RN ("RN Tarascina"). RN Tarascina arrived and performed the Heimlich maneuver on decedent. 
While doing the Heimlich maneuver, decedent lost consciousness and was lowered to the floor with the support of two nurses. The nurses checked for decedent's pulse and respiration. Finding none, a staff member called 911, and other nurses checked decedent's mouth for loose objects. Two-person CPR was performed on decedent, after a few cycles, decedent regained consciousness. Decedent was placed on her side and given oxygen until EMS arrived.
According to the Fire Department of New York (FDNY) Computer Aided Dispatch report ("the dispatch report"), a call was received at 12:22:23 P.M. The call was assigned to four units: SeniorCare, the FDNY Certified First Responders (CFR) Unit, FDNY Basic Life Support (BLS) Unit, and NYPD EMS. SeniorCare assigned emergency medical technician David Medina (EMT Medina) and paramedic Shmuel Langsam (Paramedic Langsam) to this job. The [*3]address sent to the four units was listed on the dispatch report as "1 Prospect Park W., BK Zip: 11215." At 12:23:28 P.M., the 911 dispatcher informed the units that decedent was not breathing, with more details to follow. At 12:23:44 P.M., the dispatcher relayed that CPR was being administered. At 12:24:21 P.M., the dispatch report indicated that NYPD EMS called Northern to obtain an exact location of decedent within One Prospect Park West; it was specified that she was in the basement. The dispatch report reflected this change at 12:24:41 P.M., and the information was dispersed to the four units. The dispatch report revealed that decedent was in cardiac arrest and Northern's nursing staff were performing CPR on her in the dining room. By 12:25:09 P.M., EMT Medina and Paramedic Langsam were en route. The FDNY CFR Unit arrived first at 12:27:20 P.M., SeniorCare arrived at 12:30:32 P.M., the FDNY BLS Unit arrived at 12:30:55 P.M., and NYPD EMTs followed directly behind, arriving at 12:30:59 P.M.
Police Officer Priscilla Goris (P.O. Goris) and Paramedic Langsam testified that upon arrival to Northern, there was an eight-minute delay in reaching decedent due to the three entrances into the building identified as One Prospect Park West. Paramedic Langsam further testified that the responders "were all speaking to each other as [they spread] out and look[ed] into different entrances. [They] were trying to figure out where [decedent] was." SeniorCare's patient care report timestamped its employees' contact with decedent at 12:38 P.M. Paramedic Langsam further stated that the CFR Unit found decedent first and "conveyed the message to [the other responders] of how to enter the building." The CFR Unit then provided decedent with oxygen until SeniorCare's team arrived.
After making contact, SeniorCare's employees assessed decedent. Paramedic Langsam testified that decedent was awake, looking around, combative, flailing her arms, and making sounds but unable to speak. Paramedic Langsam and EMT Medina provided advanced life support (ALS) to decedent. They put decedent on a cardiac monitor to obtain vital signs such as blood pressure, heart rate, and oxygen saturation. EMT Medina provided decedent with intravenous medicine and Paramedic Langsam followed up with oxygen using an adult cannula. Paramedic Langsam contacted the FDNY Telemetry to gain clearance for administering twenty-five milligrams of etomidate to decedent. FDNY Telemetry granted the request, and the administration was provided at 12:48 P.M. 
By 12:50 P.M., EMT Medina attempted to intubate decedent twice, but was unsuccessful because decedent's airway became swollen. EMT Medina then performed a direct laryngoscopy using Magill Forceps and pulled out a piece of meat from decedent's airway. Paramedic Langsam testified that he directed one of the NYPD EMTs to bring their ambulance closer to the President Street entrance so decedent could be easily transported into the ambulance. Decedent was placed on a stretcher and transported into the NYPD ambulance. Both the FDNY's dispatch report and SeniorCare's patient care report timestamp decedent being in transport to the nearest hospital at 12:55 P.M. The NYPD EMTs drove decedent to New York Presbyterian-Brooklyn Methodist Hospital ("Methodist") and arrived at 12:58:06 P.M.
According to Methodist's medical records, the emergency department received decedent and gave her a physical exam. Mya Lin, M.D. ("Dr. Lin") defibrillated and intubated decedent and started advanced care life support. Dr. Lin noted that decedent was pulseless upon arrival. Decedent appeared to be "blue in color and mottled with no respiratory arrest." Decedent gained [*4]spontaneous circulation for a brief time and became bradycardic and pulseless. Thereafter, decedent did not have any cardiac activity. Within an hour of arrival, decedent was pronounced dead at 1:38 P.M.
In partial opposition, Northern argued that SeniorCare's Statement of Facts in paragraphs 21 and 22was "inaccurate and incomplete." Northern asserted that SeniorCare's version of the facts contained discrepancies pertaining to its inability to locate decedent immediately upon arrival. Northern indicated that SeniorCare failed to mention that its employees had Northern's phone number upon receiving the identifying information from the 911 dispatcher, at 12:23:16 P.M. Northern maintained that all emergency medical units assigned to this job knew that CPR had already been administered by Northern's nursing staff at 12:24:41 P.M., and that decedent's location was in the basement, as per the dispatch report. Furthermore, Northern stated that SeniorCare's ALS Assessment was performed at 12:38 P.M., and at that time decedent was reported to be alert, breathing, combative, and pushing the bag-mask ventilation away from her.
In addition, Northern called attention to discrepancies between the facts asserted by SeniorCare and those indicated in P.O. Goris' deposition testimony. P.O. Goris, who at the time was an EMT for FDNY, testified that CFR had already found decedent by the time she arrived, the prehospital care report did not indicate that decedent was in the basement, despite that information being conveyed to the 911 operator. P.O. Goris further testified that the 911 operator who provided the dispatch information could have been contacted to provide an exact location. 

 Law
Granting summary judgment is a drastic measure. Marino v. Jamison, 189 AD3d 1021, 136 N.Y.S.3d 324 (2d Dept. 2020). A court's role in deciding a summary judgment motion is issue finding, rather than issue determination. Silveri v. Glaser, 166 AD3d 1044, 87 N.Y.S.3d 254 (2d Dept. 2018). Moreover, the facts must be viewed in the light most favorable to the non-movant. Khutoryanskaya v. Laser & Microsurgery, P.C., — AD3d —, 2023 WL 8440797 (2d Dept. 2023).
An action for medical malpractice requires a claimant to prove a deviation or departure from accepted medical standards of practice, and that such departure proximately caused the claimant's injuries. Blank v. Adiyody, 220 AD3d 832, 198 N.Y.S.3d 172, (2d Dept. 2023); Barnaman v. Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 184 N.Y.S.3d 800 (2d Dept. 2023). On summary judgment, defendant bears the initial burden of substantiating that there was no departure from accepted medical practice, or if there was such a departure, that it was not the proximate cause of plaintiff's injuries. Kelapire v. Kale, 189 AD3d 1197, 134 N.Y.S.3d 255 (2d Dept. 2020). 
If the defendant satisfies this burden, then the plaintiff must rebut the defendant's showing by raising a triable issue of fact as to both the departure and causation elements. See Sunshine v. Berger, 214 AD3d 1020, 186 N.Y.S.3d 326 (2d Dept. 2023); Kielb v. Bascara, 217 AD3d 756, 191 N.Y.S.3d 158 (2d Dept. 2023). If the plaintiff presents issues of facts sufficient to require a trial, then defendant's request for summary judgment must be denied. Persuad v. Hassan, 220 AD3d 895, 198 N.Y.S.3d 196 (2d Dept. 2023).

 Analysis
Medical Malpractice
SeniorCare established prima facie entitlement to summary judgment by proffering the opinion of Mark Henry, M.D. ("Dr. Henry"), a licensed specialist in emergency medical services, who relied upon decedent's medical records, various deposition testimony and accident reports to support his opinion that it did not depart from accepted medical practice. 
Dr. Henry agreed with the actions of EMT Medina and Paramedic Langsam regarding their ability to timely reach the decedent, render treatment to her upon arrival, and timely transport her to the nearest hospital. Dr. Henry stated that EMT Medina promptly drove to the address given to him within five minutes, and upon arrival, appropriately conferred with the other units to find the entrance to Northern, since the 911 dispatcher did not provide decedent's exact location. Since SeniorCare actively kept in communication with the other responders, Dr. Henry postulated that FDNY was able to seamlessly convey the precise location of decedent and EMT Medina and Paramedic Langsam were able to provide the necessary treatment.
Based upon RN Goldvekht's testimony that she, along with other nurses, placed decedent on her side and gave her an oxygen tank after she lost consciousness, and Paramedic Langsam's testimony regarding decedent having trouble breathing, Dr. Henry insisted that this evidence reflected that the decedent was already confronted with acute respiratory distress before and at the time SeniorCare's employees began working on her. Dr. Henry concluded that SeniorCare's agents responded with "lifesaving measures," all in accordance with the standard of care for a patient with an obstructed airway, choking, and in respiratory distress. 
Finally, Dr. Henry opined that SeniorCare's agents followed the obstructed airway protocol as indicated in the Regional Emergency Medical Advisory Committee of New York City ("REMAC") ALS (Paramedic) Protocol Manual, thus they did not violate any accepted standards of prehospital care. 
In opposition, plaintiff failed to proffer an argument supported by an expert affirmation to refute defendant's prima facie showing. Jean-Paul v. Jamaica Hospital Medical Center, 208 AD3d 464, 175 N.Y.S.3d 301 (2d Dept. 2022).
Moreover, Northern's partial opposition papers failed to delineate issues of facts. Northern merely restated the facts expounded throughout SeniorCare's moving papers. Thus, co-defendant's partial opposition also failed to raise a triable issue of fact. Stanton v. Oceanside Union Free School Dist., 140 AD3d 731, 32 N.Y.S.3d 620 (2d Dept. 2016).
Wrongful Death
To defeat a wrongful death claim, defendant must show that it did not deviate nor depart from accepted standards of care regarding the decedent, or that such departure, if any, was not a proximate cause of decedent's death. Noble v. Kingsbrook Jewish Medical Center, 168 AD3d 1077, 92 N.Y.S.3d (2d Dept 2019). Here, SeniorCare submitted Dr. Henry's affirmation, in which he opined that SeniorCare did not depart from the prevailing standards of care. Plaintiff failed to raise a triable issue of fact in opposition. Mendoza v. Maimonides Medical Center, 203 [*5]AD3d 715, 160 N.Y.S.3d 663 (2d Dept. 2022).
Negligent Hiring
An employer can be held liable for negligent hiring and/or retention when the employer had knowledge of or should have foreseen the employee's propensity for the conduct that caused an injury. Guarino v. ProHEALTH Care Associates, LLP, 219 AD3d 467, 194 N.Y.S.3d 517 (2d Dept. 2023). Here, SeniorCare did not submit any evidence negating that it had foresight of its employees' propensity to commit the alleged negligence. However, Dr. Henry, upon review of the pleadings, deposition testimony, bill of particulars, supplemental bill of particulars, and decedent's medical records, opined that SeniorCare consistently adhered to the standard of care. REMAC's General Operating Procedures introduction states that these protocols apply to all CFRs, EMTs, and paramedics; and defines the minimum standard of care to be provided by the prehospital personnel.
In opposition, plaintiff failed to furnish an argument to support his claim of negligent hiring. S.W. v. Catskill Regional Medical Center, 211 AD3d 890, 180 N.Y.S.3d 561 (2d Dept. 2022); Henry v. Sunrise Manor Center for Nursing and Rehabilitation, 147 AD3d 739, 46 N.Y.S.3d 649 (2d Dept. 2017). 
Carelessness, Negligence, Heedlessness, Gross Negligence, and Recklessness
With respect to plaintiff's gross negligence and recklessness claims, where defendant produced prima facie evidence that it did not "engage in grossly negligent or reckless conduct showing an utter disregard for the safety or rights of others...," plaintiff's claims are without merit and must be denied. Seti v. Carnell Associates, 218 AD3d 509, 193 N.Y.S.3d 80 (2d Dept. 2023). Plaintiff again failed to posit any facts to support his claims of gross negligence, recklessness, carelessness, or heedlessness. 
Plaintiff's opposition centered on SeniorCare's untimely arrival to decedent's location because it failed to "use common sense efforts to timely arrive at Ms. Rosinka's side while she was choking to death." Plaintiff contended that Dr. Henry's affirmation did not cite any authoritative protocols for timely arriving at a patient's side. Thus, plaintiff asserted that Dr. Henry's opinion that SeniorCare's efforts were in accordance with accepted standards of emergency response is merely conclusory.
In rebuttal to plaintiff's claim of negligence based upon delayed contact with the decedent, SeniorCare argued that the claim was grounded in medical malpractice, rather than ordinary negligence. SeniorCare expounded that emergency first responders are required to have special knowledge to effectively address a patient's condition. This includes knowledge about necessary medical treatment and the equipment needed to effectuate that treatment. SeniorCare further argued that the coaction of the responding units communicating with each other until making patient contact required specialized knowledge, therefore those actions were outside the scope of the everyday experience of ordinary laypersons. 
Medical malpractice is a specific category of negligence. To discern the difference between ordinary negligence and medical malpractice the facts of the case are paramount. "In distinguishing whether conduct should be deemed medical malpractice or ordinary negligence, [*6]the critical factor is the nature of the duty owed to the plaintiff and that the defendant is alleged to have breached." Kelty v. Genovese Drug Stores, Inc., 214 AD3d 776, 185 N.Y.S.3d 250 (2d Dept. 2023); McNally v. Montefiore Nyack Hospital, 206 AD3d 901, 168 N.Y.S.3d 700 (2d Dept. 2022). Where the crux of plaintiff's complaint revolves around defendant's failure to fulfill a duty outside of a medical one, then the claim "sounds in ordinary negligence." Id. However, a claim sounds in medical malpractice when the complaint challenges the performance of a medical entity and where the performance of functions are "an integral part of the process of rendering medical treatment and diagnosis to a patient, such as... determining the need for restraints..." Id. Indeed, the Second Department has held that one cause of action can sound in both medical malpractice and ordinary negligence. D'Elia v. Menorah Home and Hosp. for the Aged and Infirm, 51 AD3d 848, 859 N.Y.S.2d 224 (2d Dept. 2008).
Here, plaintiff raised a triable issue of fact that SeniorCare failed to sufficiently rebut. Based upon the dispatch report SeniorCare arrived at the scene at approximately 12:30PM but did not make contact with the decedent until 12:38PM. SeniorCare's employee, Paramedic Langsam, testified that the delay was due to the fact that the building had three different entrances. Plaintiff indicated that there was a sign indicating the location of Northern, and the dispatch report had the telephone number to Northern, but SeniorCare failed to use it. These facts as well as others raise an issue as to whether SeniorCare was negligent in locating the decedent and whether that delay contributed to decedent's demise. Plaintiff's claim did not require support from a physician. Id.
Locating the decedent did not involve a matter of medical science or special skills nor was it an integral part of rendering medical treatment. Thus, this cause of action sounds in negligence and a jury can make its assessment based upon its everyday experience. Cf, Kelty, 214 AD3d 776, 777; McNally, 206 AD3d 901, 903. As this Court's role upon summary judgment is simply issue finding, and not issue determination; and the facts must be viewed in the light most favorable to the non-movant, this Court finds that a jury must determine whether SeniorCare was negligent in making contact with the decedent on October 14, 2015. 

 Conclusion
Accordingly, defendant's motion for summary judgment is granted in all respects, except as to plaintiff's claim of failure to timely reach the decedent. 
This constitutes the Decision and Order of this Court. 
E N T E R
J.S.C.

Footnotes

Footnote 1: Northern Adult Day Health Care Center, also known as Northern Manor Adult Day Health Care Program ("Northern Manor") was operated by Northern Metropolitan Foundation for Health Care, a wholly owned subsidiary of Northern Foundation. On June 26, 2014, Northern Manor and the New York State Office of the Attorney General's Medicaid Fraud Control Unit entered into a written agreement, inter alia, that Northern Manor must close its Prospect Park day care, and shall pay $6,500,000.00 to the State for operating without a qualified social worker on staff to provide required social services, and for admitting more registrants than the New York State Department of Health certified for treatment. (r (bna.com)) 
Closed Adult Home to Pay $6.5 Million In New York Medicaid Fraud Settlement
(bloomberglaw.com)